**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN PEKAR, )
)
Plaintiff, )
) Civil Action No. 09-844
vs. ) Judge Nora Barry Fischer
)
U.S. STEEL/EDGAR THOMSON WORKS, )
)
Defendant. )

**MEMORANDUM OPINION**

## I.    Introduction

Plaintiff John Pekar ("Pekar") has sued his former employer, Defendant United States Steel Corporation ("Defendant"),[1] for discrimination pursuant to the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa C.S. § 951, *et seq.*, and for wrongful discharge.[2] (Docket No. 20). For his ADEA and PHRA claims, Pekar alleges that he was discharged because of his age, 50, and because Defendant would economically benefit by terminating him due to his participation in a defined benefit pension plan.[3] (Docket No. 20 at 1, 7-8). For his wrongful discharge claim, Pekar avers that he was fired for refusing to perform a task as directed by a supervisor based his own perceived safety and efficiency

---

[1]

Defendant was incorrectly identified as U.S. Steel/Edgar Thomson Works. (*See* Docket No. 1). It has identified itself as United States Steel Corporation. (Docket No. 24 at 1).

[2]

This case is related to the matter at civil action number 09-948 brought by Plaintiff Michael Diehl against Defendant United States Steel Corporation based on similar allegations. (*See* Civ. A. No. 09-948, Docket No. 22). In that case, Diehl has brought claims under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101, *et seq.*, and for wrongful discharge.

[3]

*See* notes 4 and 5, *infra.*

concerns. (Docket No. 20 at 10-11). This matter is before the Court on Defendant's Motion to Dismiss Pekar's Amended Complaint under Rule 12(b)(6), or in the alternative, for Summary Judgment pursuant to Rule 56 (Docket No. 25), in which Defendant argues that Pekar has failed to sufficiently plead an ADEA claim, his PHRA claim fails because it was already dismissed, and his wrongful discharge claim fails because he is not an at-will employee. (Docket No. 24 at 2-3). For the reasons discussed herein, Defendant's Motion (Docket No. 24) is GRANTED.

## II.    Factual Background

Pekar, a resident of the Borough of Manor, Westmoreland County, Pennsylvania, was hired by Defendant, a Pennsylvania corporation, on April 17, 1977 as a Bricklayer Helper/Laborer. (Docket No. 20 at ¶¶ 2-3,  5).  Pekar avers that throughout his employment with Defendant, he met applicable job qualifications and performed his job in a manner that met Defendant's expectations. (*Id.* at ¶ 9). On August 15, 2008, Pekar claims that he and his co-worker, Michael Diehl, were instructed by their immediate supervisor, Mark Cooke, to change the "F South Oxygen hose" (the "hose") with other co-workers. (*Id.* at ¶ 10). For this task, Cooke advised Pekar and Diehl that it might be necessary to alter the gaskets on the hose, however, they refused to make the requested alteration because to do so would violate written instructions  from the manufacturer. (*Id.* at ¶¶ 11-13).  Pekar alleges that Cooke thereafter determined that the gasket did not need to be altered. (*Id.* at ¶ 14).

Pekar claims that when he and Diehl went to change the hose, and after they removed the cardboard covering, they saw an object immediately inside the opening of the hose. (*Id.* at ¶¶ 23-26). Pekar avers that the object appeared to be a cloth rag and that he "never touched the object." (*Id.* at ¶¶ 27-28). Cooke was approximately 15 to 20 feet away from the hose when the covering was

removed and Pekar claims that he immediately called Cooke over to show him the object in the hose. (*Id.* at ¶¶ 29-30). Cooke then contacted Lee Mott, the Senior Process Leader, and requested that he come to the maintenance area, where Diehl and Pekar were, with his camera to take photographs of the hose and the object inside of it. (*Id.* at ¶¶ 31-32). Upon being instructed to do so, Diehl and Pekar then put the cardboard covering back on the hose, with the object still inside, and placed the box with the hose back in the maintenance area. (*Id.* at ¶¶ 33-34). The hose was then removed by the "parts people" and another hose was brought in to be installed. (*Id.* at ¶ 35). Pekar claims that he and Diehl were required to work overtime to complete the installation of the hose. (*Id.* at ¶ 37). Prior to doing so, Diehl and Pekar made sure that there were no objects inside the new hose; and the installation was successfully completed on August 15, 2008. (*Id.* at ¶¶38-39). After the installation, Pekar then went home at the approval of Cooke. (*Id.* at ¶40).

Pekar returned to work on his next regularly scheduled day, August 17, 2008, and nothing was said to Pekar that day about the incident with the rag. (*Id.* at ¶ 41). After reporting to work on August 18, 2008, Pekar states that he was advised by his supervisor, Lee Mott, that he was being escorted off of the property as a result of the situation concerning the object in the hose. (*Id.* at ¶¶ 44-46). At first, Pekar states that he was not sure as to what Mott was referring but that Mott advised him that there was a video camera, and "it shows all." (*Id.* at ¶¶ 47-48). Contrary to Mott's assertions, Pekar avers that he did not place the foreign object in the hose. (*Id.* at ¶ 49). However, he received a notice that he was being disciplined for the following:

> (1) Case # 08063 Sabotage of company equipment balance of turn plus four day suspension "Justice and Dignity" will not apply this slip will run concurrently with the discipline received in slip # 08064.

> (2) Case # 08064 Contamination of company equipment balance of the turn plus four day suspension "Justice and Dignity" will not apply

3

> and this slip will run concurrently with the discipline slip above #
> 08063.

*Id.* at ¶ 50). It is not averred whether Pekar did or did not serve the suspension referenced above;

rather, he claims that Defendant advised him on August 22, 2008 that he was discharged from his

position. (*Id.* at ¶ 51).

   For his ADEA and PHRA claims, Pekar alleges that but for his age, 50, he would not have

been discharged and that his discharge was motivated by Defendant's desire to reduce the retirement

benefits owed to Pekar.   (Docket No. 20 at ¶¶ 53-55). Specifically, Pekar avers that due to the length

of his employment with Defendant, upon his retirement he would have been entitled to a defined

benefit pension.[4]  (*Id.*). According to Pekar, Defendant would benefit economically by replacing him

with an individual who is entitled to only a defined contribution plan,[5] as more recently hired

employees are only eligible to participate in a defined contribution plan. (*Id.* at ¶¶ 56-57). Pekar

claims that once Defendant's obligation to a retired employee, who is a participant in a defined

benefits plan, "has been ascertained," Defendant will have access to whatever funds remain in that

plan which are not otherwise required to fund obligations to the particpant. (*Id.* at ¶ 59). Relative to

his ADEA claim, Pekar filed an administrative charge with the EEOC  and the PHRC on November

---

[4]

    A defined benefit pension plan is a plan in which the benefit on retirement is determined by a set formula, rather
than depending on investment returns. 26 U.S.C. § 414(j).  Section 414(j) of the Internal Revenue Code specifies a
defined benefit plan to be any pension plan that is not a defined contribution plan, *see* note 5, *infra*, where a defined
contribution plan is any plan with individual accounts. This type of plan promises a specified monthly benefit on
retirement that is predetermined by a formula based on the employee's earnings history, tenure of service and age, rather
than depending on investment returns. *See* http://www.businessdictionary.com (last visited January 21, 2010).

[5]

    A defined contribution plan is a plan which provides for an individual account "for each participant and for
benefits solely on the amount contributed to the participant's account, and any income, expenses, gains and losses, and
any forfeitures of accounts of other participants which may be allocated to such participant's account. 26 U.S.C. § 414(i).
The contributions in this type of plan are invested, for example, in the stock market, and the returns are credited to the
individual's account. Taylon, Don (May 21, 2009), "Retirement plans for small businesses," *Small Business*;
www.bankrate.com (last visited January 21, 2010).

4

4, 2008, and received a right to sue letter from EEOC on March 30, 2009. (*Id.* at ¶¶ 60-62). He initiated this lawsuit on June 26, 2009. (Docket No. 1).

As to his wrongful discharge claim, Pekar avers that on July 3, 2006, Glenn Reed, a Maintenance Process Leader, directed him and co-worker, Ron Vorassi[6] to replace a cable on a crane. (Docket No. 20 at ¶ 70). For this task, Reed wanted Pekar and Vorassi to use a manlift, however, they wanted to do the repairs from the top of the crane and not use a manlift because they were "concerned in good faith about safety, and refused to do the job as directed." (*Id.* at ¶¶ 71-73). After Pekar and his co-worker left the work site, Pekar alleges that a "JUM Safety Representative"[7] and a Senior Process Leader visited the site, after which Pekar and Vorassi were told to go home. (*Id.* at ¶¶ 74-75). Pekar further alleges that during the four to five years prior to his discharge, he made repeated suggestions as to how jobs could be performed more safely and efficiently, but that these suggestions were ignored. (*Id.* at ¶¶ 76-77). Pekar claims that he was discharged because of his refusal to perform a job due to safety concerns, and because of prior suggestions regarding how jobs could be done more safely. (*Id.* at ¶¶ 78-79). He further states in his Amended Complaint that termination of an at-will employee for refusing to do a job because of safety concerns and for making suggestions regarding the safety of other jobs is a violation of public policy. (*Id.* at ¶ 80). For his claims, Pekar seeks damages in the form of loss of income from the date of his discharge and into

---

[6]

Ronald Vorassi was discharged by Defendant on October 31, 2007. *See Ronald Vorassi v. US Steel/Edgar Thomson Works*, Civ. A. No. 09-769, 2009 U.S. Dist. LEXIS 79257 (W.D. Pa. Sept. 3, 2009). In a case brought before the Honorable Arthur J. Schwab of this Court, Vorassi claimed that Mr. Mott injured his elbow on October 29, 2007 and that his discharge was in violation of the PHRA and the ADEA. (Civ. A. No. 09-769; Docket No. 1 at 2). Upon a Motion to Dismiss by Defendant, Vorassi's Complaint was dismissed pursuant to Rule 12(b)(6) as time-barred. *See Ronald Vorassi v. US Steel/Edgar Thomson Works*, Civ. A. No. 09-769, 2009 U.S. Dist. LEXIS 79257.

[7]

Pekar does not aver what the acronym "JUM" represents.

the future, loss of health insurance and other fringe benefits, damages for emotional distress and punitive damages. (*Id.* at ¶¶ 64, 82).

### III.     Procedural History

Pekar and his wife, Jan Pekar, initiated this action on June 26, 2009 with the filing of their Complaint against Defendant, alleging claims under the ADEA and the PHRA, and for wrongful discharge and loss of consortium.[8] (Docket No. 1). Defendant filed a Motion to Dismiss the Complaint under Rule 12(b)(6) and/or Rule 56 on September 29, 2009. (Docket No. 7).  In their response filed on October 12, 2009 (Docket No. 12), while Pekar did not address the motion as it related to Pekar's ADEA claim, Pekar argued the merits of a claim under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101, *et seq.*, even though he had not pled such a claim in his Complaint. (*See* Docket No. 1). Additionally, Pekar conceded that his PHRA claim was time-barred, Jan Pekar agreed to withdraw her loss of consortium claim, and Pekar requested leave to amend his claims. (Docket No. 12 at 6-7).  As a result, on October 13, 2009, Pekar's PHRA claim and Jan Pekar's loss of consortium claims were dismissed and Pekar was ordered to file an Amended Complaint on or before November 13, 2009, thereby terminating, as moot, Defendant's motion to dismiss. (Docket No. 13).

In the interim, the Court held a case management conference with counsel for the parties on October 29, 2009 and set down deadlines for fact discovery and for the completion of ADR. (Docket Nos. 17, 18, and 19). On November 13, 2009, Pekar filed his Amended Complaint (Docket No. 20) setting forth claims under the ADEA and the PHRA, and a pendent state law claim for wrongful

---

[8]

Pekar and his wife also initially sued Defendant Hose Master, Inc., but that Defendant was dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) upon a stipulation by Plaintiffs (Docket Nos. 3 and 4).

discharge. Defendant filed the instant Motion to Dismiss the Amended Complaint, or in the alternative, for Summary Judgment and Brief in Support on December 3, 2009. (Docket Nos. 24 and 26). In support of the motion, Defendant attached the following: (1) Diehl's PHRA Charge of Discrimination (Docket No. 26-1); (2) Diehl's EEOC Right to Sue Letter (Docket No. 26-2); (3) the affidavit of Michael A. Stehura, the Manager of Retired Employee Services for Defendant and Carnegie Pension Fund (Docket No. 26-3); (4) the collective bargaining agreement between Defendant and the United Steelworkers of America (Docket No. 26-4); and (5) the arbitration award from Pekar's union grievance (Docket No. 26-5).

On December 28, 2009, Pekar filed his Brief in Opposition; in said brief, Pekar again argued the merits of an ADA claim and his claim for wrongful discharge, while he did not respond to Defendant's argument for dismissal of his ADEA or PHRA claims. (Docket No. 27). Defendant filed its Reply to Pekar's Brief in Opposition on January 7, 2010, arguing that Pekar waived his ADEA and PHRA claims by his failure to respond to Defendant's arguments relating to same.[9] (Docket No. 28). On January 14, 2010, Pekar filed a corrected Brief in Opposition as an errata on the docket (Docket No. 31), in which Pekar argues the merits of his ADEA claim. (*Id.* at 4-7). The next day on January 15, 2010, Defendant filed a motion for leave to file an amended reply brief, which motion the Court granted giving Defendant until January 22, 2010 to file said brief. (Docket Nos. 32 and 33, respectively). Defendant filed its Amended Reply Brief on January 22, 2010. (Docket No. 34). As Defendant's Motion (Docket No. 24) is fully briefed, it is now ripe for

---

[9]

On January 8, 2010, the Court granted a motion by Defendant for extensions of time to complete fact discovery and the ADR process. (Docket Nos. 29 and 30). The Court ordered that the deadlines for the completion of fact discovery, the post-fact discovery status conference and for the completion of ADR, as contained in the Case Management Order (Docket No. 18) and the order referring this case to Early Neutral Evaluation (Docket No. 19), are held in abeyance pending the Court's ruling on the present motion to dismiss. (Docket No. 24).

disposition.

## IV.    Standard of Review

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2008)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); and FED. R. CIV. P. 8(a)(2)(a valid complaint requires only "a short and plain statement of the claim" showing entitlement to relief."). The Supreme Court in *Iqbal* clarified that the decision in *Twombly* "expounded the pleading standard for 'all civil actions.'" *Iqbal*, 129 S.Ct. at 1953; *Fowler*, 578 F.3d at 210-11. The Court further explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Iqbal*, 129 S.Ct. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Fowler*, 578 F.3d at 210; and *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008). The determination of whether a complainant has sufficiently pled a claim "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950 (citing *Twombly*, 550 U.S. at 556); *see also Fowler*, 578 F.3d at 210-11 (holding that in light of *Iqbal*, a district court should first separate the factual and legal elements of a claim and then, accepting the "well-pleaded facts as true," "determine whether the facts" pled are sufficient to show a "'plausible claim for relief.'"). Ultimately, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

Generally, the only documents a court may consider at the motion to dismiss stage, without converting the motion to dismiss into a motion for summary judgment, are those documents attached to the complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). However, in evaluating a Rule 12(b)(6) motion, a court "may look beyond the complaint to matters of public record, including court files and records ... and documents referenced in the complaint or essential to a plaintiff's claim which are attached to either the [c]omplaint or the defendant's motion." *Spence v. Brownsville Area Sch. Dist.*, Civ. A. No. 08-0626, 2008 U.S. Dist. LEXIS 55026, at *7 (W.D. Pa. July 15, 2008)(citing *Pension Benefit*, 998 F.2d at 1196)). A court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Miller v. Clinton County*, 544 F.3d 542, 550 (3d Cir. 2008)(quoting *Pension Benefit*, 998 F.2d at 1196). Otherwise, a plaintiff with a legally insufficient claim could survive a motion to dismiss "simply by failing to attach a dispositive document on which it relied." *Pension Benefit*, 998 F.2d at 1196.

In the instant case, in moving to dismiss or in the alternative for summary judgment, Defendant included a number of documents, listed above, that were not attached to Pekar's Amended Complaint. (*See* Docket No. 26-1 - 26-5). Two of these documents are EEOC and PHRC documents, which are matters of public record and may be considered by the Court without converting the motion to one for summary judgment. *Pension Benefit*, 998 F.2d at 119. Consideration of all the remaining documents attached to Defendant's motion, except for the affidavit of Michael Stehura (Docket No. 26-3), would not require the Court to convert the motion to one for summary judgment because the documents are integral to and explicitly relied upon by Pekar in his Amended Complaint

and his Brief in Opposition to Defendant's motion (*see* Docket No. 31 at 7-9). *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)(court may consider a "document *integral to or explicitly relied* upon in the complaint" without converting a motion to dismiss to a motion for summary judgment)(emphasis in original; quotation and citations omitted).  Moreover, Pekar does not dispute the authenticity of these documents. *Pension Benefit*, 998 F.2d at 1196.  Thus, in analyzing the motion, the Court will not consider the affidavit of Michael Stehura because it is neither relied upon by Pekar nor a public record.[10]  Further, it is not crucial to the Court's analysis herein. Accordingly, the Court will consider the remaining documents and analyze the motion under Rule 12(b)(6).

V.      **Discussion**

A.      **Filing of Pekar's Corrected Brief in Opposition**

At the outset the Court notes that in its Amended Reply brief (Docket No. 34), Defendant requests that the Court strike Pekar's corrected Brief in Opposition, filed as an errata (*see* Docket No. 31) because Pekar did not request leave of Court to file such a pleading (Docket No. 34 at 1). While the Court may, in its discretion, disregard Pekar's corrected filing because his counsel did not follow proper procedure by requesting leave of Court to file his corrected brief,[11] the Court will not

---

[10]

The Court is not persuaded by Defendant's argument that because Pekar was under an obligation to respond to the affidavit and failed to do so, the Court may consider the affidavit as undisputed and grant summary judgment to Defendant. (*See* Docket No. 34 at 6).  When a motion to dismiss is framed in the alternative as a motion for summary judgment, a district court must put the non-moving party on notice prior to considering the motion as one for summary judgment. *Castle v. Cohen*, 840 F.2d 173, 179-80 (3d Cir. 1988).  In that event, a court may consider an uncontested document as undisputed for purposes of summary judgment. *Hilfirt v. Shipman*, , 91 F.3d 573, 579 (3d Cir. 1996).  Based on the foregoing and because the affidavit is not crucial to the Court's rulings herein, the Court declines to consider the motion as one for summary judgment, and thus, will not consider the affidavit of Michael Stehura. (Docket No. 26-3).

[11]

This is despite the fact that, upon inquiry by Pekar's counsel, this Court's law clerk advised Pekar's counsel of the need to request permission from the Court prior to filing a corrected brief in response to Defendant's Motion to Dismiss.

punish Pekar for his counsel's failure to follow the rules. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 308, 395 (1993). Rather, the Court admonishes Pekar's counsel to comply with this Court's orders, policies and procedures in the future.

**B.      Untimeliness of Pekar's Brief in Opposition**

Defendant points to Pekar's late filing of his original Brief in Opposition (Docket No. 27) in support of its request that the Court strike said Brief as untimely. (Docket No. 34 at 3-4).  As noted, Defendant filed the instant motion on December 3, 2009; therefore, according to the Court's Order on Motions Practice (Docket No. 10), Pekar was required to file his response within 20 days, i.e. by December 23, 2009. However, Pekar did not file his Brief in Opposition until December 28, 2009, five days late. (Docket No. 27). If the Court were to follow the new time frames set forth in the Federal Rules of Civil Procedure, Pekar would have been required to file his response within 21 days, i.e. by December 24, 2009. Thus, according to both this Court's order and the Federal Rules, Pekar's response was untimely.  Permitting three days for delivery of Pekar's Brief in Opposition and one extra day given that December 25, 2009 was a holiday, Pekar's Brief would not have been received until December 24, 2009, one day late according to this Court's order, but timely under the new Federal Rules.  *See Mosel v. Hills Dep't Store*, *Inc.*, 789 F.2d 251, 253 n.2 (3d Cir. 1986)(citing FED. R. CIV. P. 6(e)'s three day presumption).  Nonetheless, while counsel for Pekar certainly did not act in a diligent manner in accordance with this Court's order (Docket No. 13), the Court has discretion to strike the pleading or allow the untimely filing. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 308, 395 (1993)(court has discretion to forgive an untimely filing

dependent on the relevant circumstances and the prejudice factor).[12]  Additionally, dismissals under Rule 12(b)(6) for purposes of sanctioning a litigant are disfavored. *See Husick v. Allegheny County*, 304 Fed. Appx. 977 (3d Cir. 2008)(not-precedential)(citing *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991)(holding that Rule 12(b)(6) motions should not be granted without an analysis of the merits of the underlying complaint)). Hence, the Court will not punish Pekar for his counsel's lack of diligence. Rather, the Court again warns Pekar's counsel to act more diligently in the future and to comply with the time limits proscribed in the Federal Rules of Civil Procedure and by this Court.

### C.      Pekar's Claim under the ADEA

Defendant moves to dismiss Pekar's ADEA claim on the grounds that he has failed to provide factual allegations to make a showing that he is entitled to relief. (Docket No. 36 at 4; Docket No. 34 at 4). In support thereof, Defendant specifically points to Pekar's allegation that "but for his age, he would not have been discharged," and his allegations relating to his participation in a defined benefit plan.  (*Id.* at 4 (citing Docket No. 20 at ¶¶ 53, 62)). Because Pekar claims that his termination was because of his participation in a defined benefit plan, and not solely based on his age, Defendant argues that Pekar has failed to show the necessary element of an ADEA claim,  that age was the "but-for" cause of the employer's decision. (Docket No. 26 at 4-5). Furthermore, Defendant argues Pekar's claim fails because he has not claimed that he was replaced by a younger employee, rather, he speculates that Defendant may replace him with an employee who would fall

---

[12]

    In *Pioneer*, the Supreme Court noted its prior precedent that a client must be held accountable for the acts and omissions of their attorneys. *Pioneer*, 507 U.S. at 396 (citing *Link v. Wabash R. Co.*, 370 U.S. 626 (1962); and *United States v. Boyle*, 469 U.S. 241 (1985)(where the court penalized the client for their counsel's tardy filing of a tax return)). Here, as noted *supra*, because Defendant has not shown that is has suffered any prejudice, the Court will not penalize Diehl for his counsel's neglect.

under a different benefit plan. (*Id.*). To this end, Pekar has failed to show that participation in a particular plan correlates with age. (Docket No. 34 at 5).   In addition, Defendant contends that Pekar's claim is inconsistent with the fact that his co-worker, Michael Diehl, at the age of 35, was discharged for the same offense. (Docket No. 26 at 5-6).

Pekar argues in response that he has pled all the requisite elements of an ADEA claim, that is, that he was discharged because of his age.[13] (Docket No. 31 at 6). Pekar further contends he may sufficiently plead an ADEA claim by demonstrating that a legitimate factor, his participation in a certain benefit plan, acted as a proxy for age with Defendant "supposing a correlation between the two factors and acting accordingly." (*Id.* at 7). Pekar concedes that a plaintiff must show that age was the "but-for" cause of the adverse employment action. (*Id.*).

The ADEA prohibits employers from discriminating against "any individual...because of such individual's age." 29 U.S.C. § 623(a)(1). Congress passed the ADEA to "combat the unfounded stereotypes that older workers are less capable than younger workers." *Kelly v. Moser, Patterson, & Sheridan, LLP*, Civ. A. No. 08-3318, 2009 U.S. App. LEXIS 22352, at *8, 107 Fair. Empl. Prac. Cas. (BNA) 777 (3d Cir. Oct. 9, 2009)(citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993). "Accordingly, the Act prohibits employers from 'rely[ing] on age as a proxy for an employee's remaining characteristics, such as productivity.'" *Kelly*, 2009 U.S. App. LEXIS 22352, at *8 (quoting *Hazen*, 507 U.S. at 611). The ADEA requires employers to "instead focus on those

---

[13]

In his corrected Brief in Opposition to Defendant's motion, Pekar also argues that his ADEA claim is not time-barred. (Docket No. 31 at 5-6). However, Defendant did not move to dismiss the ADEA claim on this ground (*see* Docket No. 26); therefore, the Court will not address the timeliness of Pekar's ADEA claim herein. It appears that Pekar's counsel, who is the same as Michael Diehl's counsel in the case at civil number 09-948, *Michael Diehl v. U.S.Steel/Edgar Thomson Works*, seems to be confusing the instant case with the matter at civil number 09-948, wherein Defendant moved to dismiss Diehl's ADA claim as barred by the applicable 90 day statutory period. (*See* Civ. A. No. 09-948, Docket No. 26).

[non-age] factors directly." *Hazen*, 507 U.S. at 611.

As noted by Pekar, a plaintiff may establish that a legitimate factor acts as a proxy for age, with the employer "suppos[ing] a correlation between the two factors and act[ing] accordingly." *Hazen*, 507 U.S. at 612-13. But to prove a violation of the ADEA, it does not suffice to show that age played some minor role in the decision. *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2350-51, 174 L. Ed. 2d 119 (2009). A plaintiff must show that age was the "but for" cause of the adverse employment action--that age had "a determinative influence on the outcome." *Id.* at 2350 (quoting *Hazen*, 507 U.S. at 610); indeed, Pekar concedes this point of law. (*See* Docket No. 31 at 7). In conjunction with this requirement, a plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the position; (3) that he was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discrimination. *Heilman v. Allegheny Energy Serv. Corp.*, Civ. A. No. 08-4523, 2009 U.S. App. LEXIS 24937 (3d Cir. Nov. 12, 2009)(citing *Gross*, 129 S.Ct. 2343; and *Fasold v. Justice*, 409 F.3d 178, 184-85 (3d Cir. 2005)).

Courts interpreting the ADEA have held that an employer is not prohibited from making an employment decision on the basis of compensation, pension systems or benefit plans, because even though these things are often correlated with age, they are analytically distinct. *Hazen*, 507 U.S. at 611; *see also Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287 (11th Cir. 1998).[14] Further, "[t]he ADEA prohibits age discrimination and age discrimination alone." *Broaddus*, 145 F.3d at 1287 (citing *Hazen*, 507 U.S. at 611).

---

[14]

This is not to suggest that an employer lawfully could fire an employee in order to prevent his pension benefits from vesting, as such conduct is actionable under section 510 of the Employee Retirement Income Act, but it would not, without more, violate the ADEA. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142-43 (1990).

While a plaintiff need not establish a prima facie case or plead evidence, the complaint must supply enough factual basis to provide fair notice to the defendant of the allegedly unlawful conduct and to "nudge" the claim "across the line from conceivable to plausible." *See Fowler*, 578 F.3d at 213; *Iqbal*, 129 S.Ct. at 1951.   In light of *Iqbal*, the United States Court of Appeals for the Third Circuit has instructed that district courts should first separate the factual and legal elements of a claim and then, accepting the "well-pleaded facts as true," "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*,  578 F.3d at 210-11.

Here, Pekar alleges:

> But for Mr. Pekar's age, he would not have been discharged. (Docket No. 20 at ¶ 53).
>
> The Defendant's discharge of the [sic] Mr. Pekar because of his age violates the Age Discrimination in Employment Act [29 U.S.C. § 623 (a)(1)]. (*Id.* at ¶ 54).
>
> Because of his age and length of employment with U.S. Steel, upon his retirement he is entitled to a defined benefit pension. (*Id.* at ¶ 55).
>
> More recently hired employees of U.S. Steel are eligible only to participate in a defined contribution pension plan upon their retirement. (*Id.* at ¶ 56).
>
> U.S. Steel will benefit economically by replacing Mr. Pekar, who is entitled to a defined benefit pension, with an individual who is entitled only to a defined contribution pension. (*Id.* at ¶  57).
>            ....
>
> Once the obligation of U.S. Steel to the retired employees of U.S. Steel who are participants in the defined benefits plan has been ascertained, U.S. Steel will have access to whatever funds remain in the defined benefit plan which are not otherwise required to fund the obligations. (*Id.* at ¶ 59).

As noted, Pekar argues that these allegations are sufficient to state an ADEA claim. (Docket No. 31

at 6-7).  Pekar's position would mean that so long as a plaintiff asserts merely that age was a determining factor in the adverse employment action, he is entitled to discovery and his claim must survive a motion to dismiss. This position is contrary to the pleading requirements as set forth in *Iqbal* and *Twombly*, *supra*. A mere allegation that an adverse employment action was motivated by age, without more, is the type of broad conclusory allegation which the Supreme Court has found insufficient. *See Twombly*, 550 U.S. at 555; *Iqbal*, 129 S.Ct. at 1950. While Pekar is not required to plead every element of a prima facie case or provide detailed factual allegations, he must provide sufficient non-speculative and non-conclusory allegations that, accepted as true, state a claim for age discrimination under the ADEA. *Iqbal*, 129 S.Ct. at 1951.  The Court agrees with Defendant that the allegations in the Amended Complaint are not sufficient to meet the *Iqbal* test.

Although Pekar alleges the conclusion that "[b]ut for [his] age, he would not have been discharged" (Docket No. 20 at ¶ 53), the factual allegations to support this conclusion are that Defendant's decision was motivated by his participation in a particular pension plan and by a desire to "benefit economically by replacing Mr. Pekar, who is entitled to a defined benefit pension, with an individual who is entitled only to a defined contribution pension." (*Id.* at ¶ 57). As discussed above, such a motivation alone does not violate the ADEA. *See Hazen*, 507 U.S. at 611. The Supreme Court has stated "[e]ven if the motivating factor is correlated with age," the evils the ADEA seeks to combat -- "the problem of inaccurate and stigmatizing stereotypes" -- are not present "[w]hen then employer's decision is wholly motivated by factors other than age." *Hazen*, 507 U.S. at 610-11. Thus, to state a valid ADEA claim, Pekar must allege some facts showing that his *age* was a determining factor in Defendant's decision to terminate him. *Broaddus*, 145 F.3d at 1287. Instead, as his opposition brief repeats, his position is that he was discharged because of his participation in

16

a defined benefit pension plan when newly hired employees are only eligible for a defined contribution plan. He does not, however, provide any factual basis for his assertion that his *age* was a motivating factor in Defendant's decision, separate from any correlation his age may have with his benefits. Pekar also fails to plead any factual matter that Defendant correlated different pension plans with age or that he was replaced with a younger employee. (*See* Docket No. 20 at 7-9).

For the above reasons, the Court finds that Pekar's benefit-defeating motivation allegation does not state a claim under the ADEA.[15] However, because the Court finds that it would not be futile to permit Pekar to amend this claim, *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000), Pekar shall be granted leave to amend to set forth more fully his claim under the ADEA.

### C.   Pekar's PHRA Claim

Defendant also argues that Pekar is not entitled to re-plead his claim under the PHRA, which he has already conceded was not timely and the Court has dismissed, with prejudice, on October 13, 2009. (Docket No. 26 at 6-7; Docket No. 13). In his corrected Brief in Opposition (Docket No. 31), Pekar does not respond to this argument. In Defendant's Amended Reply (Docket No. 34), it argues that because Pekar has failed to respond to its argument for dismissal of this claim, his claim is waived. (Docket No. 34 at 7).

In his Amended Complaint, filed on November 13, 2009, Pekar states a PHRA claim identical to the one he pled in his original Complaint. (*See* Docket No. 20 at 9; Docket No. 1 at 9). As correctly noted by Defendant, this claim was dismissed, with prejudice, by the Court in an Order on Defendant's first Motion to Dismiss filed on October 13, 2009. (*See* Docket No. 13). By that

---

15

The Court further notes that Pekar's co-worker, Michael Diehl, at the age of 35, was discharged for the same incident with the hose at the same time as Pekar. (Docket No. 26-2 at 2).

Order, the Court dismissed said claim based on Pekar's concession that it was time-barred. (Docket No. 13). Consequently, to the extent that Pekar re-states a PHRA claim in his Amended Complaint (*see* Docket No. 20 at 9), said claim fails and is dismissed, with prejudice.

Having already dismissed Pekar's PHRA claim, the Court need not address Defendant's argument that Pekar failed to plead sufficient factual matter showing that he is entitled to relief under the PHRA. (*See* Docket No. 26 at 7-8).

### D.      Pekar's Wrongful Discharge Claim

Defendant next moves to dismiss Pekar's state law claim for wrongful discharge. In support thereof, Defendant points out that Pekar was not an at-will employee. (Docket No. 26 at 9). Rather, he was a union member of the United Steelworkers of America whose employment was subject to a collective bargaining agreement ("CBA") with Defendant. (Docket No. 26 at 8-9; *see* Docket Nos. 26-4, 26-5). As such, he cannot maintain a cause of action for wrongful discharge as the CBA protects him from indiscriminate discharge. (Docket No. 26 at 9-10). Moreover, Defendant argues, Pekar had the opportunity to fully grieve his discharge through the available grievance and arbitration provisions outlined in the CBA, which constitutes the "sole procedure" for any claims that Defendant violated the CBA. (Docket No. 26 at 10; Docket No. 26-4 at 3, 7-11). Because Pekar fully grieved his termination and went through all steps of the grievance procedure, which included an arbitration (*see* Docket No. 26-5), Pekar's wrongful discharge claim should be dismissed. (Docket No. 26 at 10).

Pekar argues in response that he is entitled to bring this claim despite the fact that he was a member of a collective bargaining unit at the time of his discharge because the remedy he now seeks for this claim, namely the loss of past and future income, was not available to him under the CBA

and he was not successful at his arbitration hearing.[16] (Docket No.31 at 8-9).  For this proposition, Pekar cites to the dissenting opinion in *Phillips v. Babcock & Wilcox*, 503 A.2d 36 (Pa. Super. 1986), *appeal denied*, 521 A.2d 933 (Pa. 1987), wherein then President Judge Edmund Spaeth, Jr. opined that the "public interests implicated in the retaliatory discharge of a contractual employee are no less than those implicated in the retaliatory discharge of an at-will employee, and deserve no lesser protection." *Phillips*, 503 A.2d at 358 (J., Spaeth, dissenting).[17]  Pekar further argues that this cause of action should stand because the issue which Pekar raises for his claim has not been heard in any forum. (*Id.* at 9). Hence, Pekar contends he should not precluded by his union membership from pursuing a wrongful discharge claim. (*Id.* at 10).

The action for wrongful discharge in Pennsylvania was judicially created by the Pennsylvania Supreme Court in the case of *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (Pa. 1974). In *Geary*, the court carved out a very narrow exception to the established rule, referred to as the "at-will doctrine," which held that absent a statutory or contractual provision to the contrary, either party could terminate an employment relationship for no reason or any reason at all. *See also Phillips v. Babcock & Wilcox*, 349 Pa. Super. 351, 503 A.2d 36, 37 (Pa. Super. 1986); *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 434-35 (3d Cir. 1986).  Where no clear mandate of public policy is violated by the termination of an at-will employee, an employee at-will has no cause of

---

[16]

The Court notes that Pekar's assertion that he is seeking remedies in this Court that were not available to him under the CBA is not entirely accurate. The arbitration award for Pekar's grievance states that the remedy requested included to return Pekar to work, and "pay all monies due and make employee whole." (Docket No. 26-5 at 2).

[17]

It should be noted that before Judge Spaeth's expiration of his term on the Superior Court of Pennsylvania , he joined in the majority opinion that union employees protected by a CBA could not bring a wrongful discharge claim. *Phillips*, 503 A.2d at 351.

action for wrongful discharge.[18] *Geary*, 319 A.2d 174; *Phillips*, 503 A.2d at 37. Thus, it is implied in *Geary* that an employee at-will can maintain a wrongful discharge claim where "a clear mandate of public policy has been violated by the termination." *Phillip*, 503 A.2d at 37.  The Superior Court of Pennsylvania has held that the purpose of the holding in *Geary* was to provide a remedy for employees with no other recourse, whether it be contractual or statutory, against wrongful discharge. *Id.*

Under Pennsylvania law, however, "an employee represented by a labor union and covered by a collective bargaining agreement cannot maintain" an action for wrongful discharge. *Coppola v. JNESO-Pocono Med. Ctr.*, Civ. A. No. 08-798, 2009 U.S. Dist. LEXIS 76420, *6 (M.D. Pa. Aug. 29, 2009)(citations omitted). On this point, Pennsylvania courts have made it clear that the tort of wrongful discharge does not extend to union employees covered and protected by a CBA. *Coppola*, 2009 U.S.Dist. LEXIS 76420, at *6 (citing *Harper v. Am. Red. Cross Blood Servs.*, 153 F.Supp.2d 719, 721 (E.D. Pa. 2001); and *Phillips*, 503 A.2d 36).

Based on the above-cited cases, it is clear that Pekar is not entitled to pursue a wrongful discharge claim.  It is undisputed that Pekar was not an at-will employee, but rather, he is a member of the United Steelworkers of America ("USWA") and a member of the bargaining unit. (*See* Docket No. 26-4; Docket No. 31 at 8-9). It is further undisputed that as a member of this union, Pekar's employment with Defendant was governed by a CBA negotiated between Defendant and USWA; which CBA was  in effect at the time of Pekar's discharge.  (*Id.*). The CBA further provides in detail

---

[18]

An at-will employee is defined as one whose employment is not governed by a written contract for a specific term and who is terminable at the will of either the employer or the employee. *Werner v. Zazyczny*, 545 Pa. 570, 681 A.2d 1331 (Pa. 1996); *see also Hokanson v. Vygon US, LLC*, 2009 Phila. Ct. Com. Pl. LEXIS 210, at *3-4 (Pa. C.&D. 4th, Aug. 28, 2009)("at-will" simply means that "absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any reason or no reason.")

the grievance procedure available to Pekar and other bargaining unit employees to challenge their dismissals. (*Id.* at 6-26). If a covered employee believes their discharge was without proper cause, they may bring a grievance under the applicable grievance and arbitration provisions. (*Id.*). The CBA also states that its provisions "constitute the sole procedure for the processing and settling of any claim by an Employee or the Union of a violation by the Company of this Agreement." (*Id.* at 3). Based on these facts, under Pennsylvania law, it appears that Pekar is not within the category of employees that may pursue the cause of action for wrongful discharge. *See also Coppola*, 2009 U.S. Dist. LEXIS 76420, *6.

In response to Pekar's argument that the allegations in support of his wrongful discharge claim have not been previously litigated, the Court notes that it is uncontested that Pekar fully grieved his termination and went through all the steps of the grievance procedure including arbitration. (Docket No. 31 at 8-9; Docket No. 26-5). After a full hearing, the arbitrator found in favor of Defendant, and denied Pekar's grievance. (Docket No. 26-5 at 14-15). Thus, any new allegation Pekar now makes should have been raised during the arbitration process, which is the "sole procedure" for adjudicating contractual disputes between Pekar and his employer. (*See* Docket No. 26-4 at 3); *Randolph v. Cooper Indus.*, 879 F.Supp. 518, 521 (W.D. Pa. 1994).

The Court also finds no merit in Pekar's argument that because he was unsuccessful with his grievance, he has no other remedy available to him. As correctly pointed out by Defendant (Docket No. 28 at 5-6), Pekar could have pursued an action for statutory remedies under federal labor law, i.e. under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 185, for breach of the terms of the CBA. *See also Raczkowski v. Empire Kosher Poultry*, 185 Fed. Appx. 117 (3d Cir. 2006)(not-precedential); *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999). His

failure to file suit under the LMRA does not give him the right to now seek redress that is only available to at-will employees. *See DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 171-72 (1983). Accordingly, the Court finds that Pekar's claim for wrongful discharge fails and said claim is dismissed, with prejudice.

**VI.    Conclusion**

For the foregoing reasons, the Court finds that Pekar's ADEA claim is insufficiently pled under the standards set forth by the Supreme Court in *Twombly* and *Iqbal*, *supra*.  However, because the Court finds that amendment would not be futile, Pekar shall be granted leave to amend his ADEA claim. As his PHRA claim was previously dismissed with prejudice (Docket No. 13), to the extent that Pekar renews said claim in his Amended Complaint (Docket No. 20), it is dismissed, with prejudice.  Additionally, the Court finds that Pekar's Pennsylvania state law claim for wrongful discharge fails as he is not an at-will employee. Consequently, Defendant's Motion to Dismiss (Docket No. 25) is GRANTED. An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:         January 29, 2010.
CC/ECF:       All counsel of record.

22